IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TOMMY ROBINSON, #226-992,       *

                         *

     Plaintiff              *

                         *

      v.                *          Civil Action No. DKC-16-2527

                         *

FRANK B. BISHOP, JR., Warden,    *

MICHAEL P. THOMAS, Security Chief,  *

LT. JEFFREY L. McFARLAND,     *

CO II JOSEPH M. McKENZIE,     *

CO II BRANT A. RICE,         *

CO II ALICIA A. CARTWRIGHT,    *

JEFFFREY NINES, Handicap Coordinator *

WESTERN CORRECTIONAL       *

   INSTITUTION,              *

                         *

     Defendants           *

                       ***

## MEMORANDUM OPINION

This case has been stayed twice, first awaiting a decision from the United States Court of

Appeals for the Fourth Circuit (ECF No. 47), and more recently at Plaintiff's request due to other

litigation burdens. (ECF No. 63). When Mr. Robinson failed to file required status reports and

initiated other litigation, he was directed to show cause why the stay should not be lifted. The

court has received his response. ECF No. 67. The response contains no legitimate basis for

continuing the stay and it will be lifted. There is a pending motion to dismiss that simply renews

an earlier motion that was denied without prejudice due to the first stay. (ECF Nos. 33 and 56).

Mr. Robinson filed a response in opposition (ECF No. 46) to Defendants' initial motion to dismiss

or, in the alternative, motion for summary judgment. The issues are now ready for resolution.

Two preliminary matters must be resolved. The motion to dismiss or, in the alternative,

motion for summary judgment was filed on behalf of Defendants Bishop, McFarland, McKenzie,

Rice, Cartwright, and Nines. Defendant Thomas, who was named in the complaint but was not

served, retired in 2014. ECF No. 9-1 at 2. Mr. Robinson attributes no wrongdoing to Mr. Thomas and includes him as a Defendant based on Mr. Thomas' job title as chief of security and a note, dated July 29, 2013, in which Mr. Thomas explained that Mr. Robinson would be moved back to his preferred housing area when space permitted. ECF No. 1 at 3, 8. Mr. Thomas is not liable for damages under 42 U.S.C. § 1983 based on his supervisory responsibilities, *see Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004), and the complaint provides no basis for finding that Mr. Thomas knew and ignored unconstitutional conduct on the part of those he supervised. Thus, had he been served in this case, Mr. Thomas would be entitled to dismissal.

Additionally, Western Correctional Institution was named as a Defendant; however, inanimate objects such as buildings, facilities, and grounds do not act under color of state law and are not subject to suit under § 1983. *See Smith v. Montgomery Cty. Corr. Facility*, Civil Action No. PWG-13-3177, 2014 WL 4094963, at *3 (D. Md. Aug. 18, 2014) (holding that Montgomery County Correctional Facility "is an inanimate object that cannot act under color of state law and therefore is not a 'person' subject to suit under Section 1983"); *Preval v. Reno*, 57 F.Supp.2d 307, 310 (E.D. Va. 1999) (stating that "the Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983"); *Brooks v. Pembroke City Jail*, 722 F.Supp. 1294, 1301 (E.D. N.C. 1989) (noting that "[c]laims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit"). Conduct amenable to suit under 42 U.S.C. § 1983 must be conduct undertaken by a person. The claim against Western Correctional Institution shall also be dismissed.

Because the parties submitted and the court will consider exhibits outside of the pleadings to determine the outcome of this case, Defendants' motion shall be treated as a motion for summary judgment under Fed. R. Civ. P. 56. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021).

For reasons discussed below, Defendants' motion shall be granted and Mr. Robinson's cross-motion for summary judgment shall be denied.

**Background**

A.    Plaintiff's Allegations

Mr. Robinson seeks declaratory judgment concerning violations of the Americans with Disabilities Act ("ADA"), an injunction against harassment, back pay for participation in a program from which he was excluded, and compensatory and punitive damages. He alleges that Defendants engaged in acts of retaliation in violation of his First Amendment right of access to the courts and that he was denied equal protection when he was denied participation in a prison program, moved to a different housing unit, and by Defendants' failure to grant him privileges he previously earned as an Honor Tier prisoner. ECF No. 1 at p. 19.

His claims arise from Mr. Robinson's inability to participate in the VetDog program at Western Correctional Institution ("WCI"), a prison puppy training program designed to benefit disabled military veterans. Mr. Robinson states that he is an honorably discharged military veteran (ECF No. 46-15 at 5-6), yet was denied participation in the program due to disability, race,[1] and in retaliation for filing an Administrative Remedy Procedure complaint ("ARP") contesting the denial, as well as other ARPs on matters unrelated to this case.[2] He contends that he was

_____

[1]    Mr. Robinson identifies himself as Hispanic and Native American and alleges that no Hispanic prisoners have been selected for the VetDog Program. ECF No. 46 at 2. Mr. Robinson is identified as African American in his criminal case. *See* http://casesearch.courts.state.md.us. Mr. Robinson's racial makeup, whether African American, Native American, or Hispanic, amounts to a difference without distinction for the purpose of adjudicating the pending dispositive motion, as the court accepts Mr. Robinson's statement, which is not contradicted by Defendants, that he is a member of a racial minority.

[2]    Mr. Robinson submits a number of these unrelated grievances and other correspondence as exhibits to his Response. The merits of Mr. Robinson's allegations concerning cyclical wheelchair replacement (ECF No. 46-35 at 29-30)) and a lack of access to higher-paid prison work

wrongfully transferred from his disability-equipped housing area, Housing Unit ("HU") 1, to HU 2, which did not meet his physical needs. ECF No. 46-35 at 1 (ARP dated July 12, 2015). Mr. Robinson further complains that as a result of the transfer, he and other handicapped individuals who were part of the "Honor Tier" lost the privileges they had earned while housed in the ADA-compliant area now dedicated to VetDog program participants. *Id.*

Mr. Robinson also alleges that his move resulted from his complaints regarding sexual harassment from a fellow prisoner[3] and his support for fellow prisoner Wayne Leo Savoy, for whom he had signed a petition; that he has been a victim of constant intimidation, threats, an unnecessary cell search, and retaliation by Defendants McFarland, Cartwright, and Rice; and that Mr. Cartwright conspired with the others to dismiss his ARPs. Mr. Robinson supports his claims with numerous ARPs and other exhibits attached to his complaint and opposition. ECF Nos. 1 and 46.

B.    Defendants' Response

Defendants explain that, in partnership with America's VetDog Veteran's K-9 Corps and Guide Dogs Foundation ("VetDog Program"), WCI offers a program for prisoners to raise, socialize. and teach puppies basic command skills for placement with disabled veterans. ECF No. 33-3, Decl. of Jeffrey L. McFarland, at ¶ 5. Mr. McFarland, who was assigned as HU 1's manager in 2013, also served as the VetDog program coordinator. *Id.* at ¶ 4.

---

assignments (ECF No. 46-2 at 2-3; ECF No. 46-5 at 2) are not properly before this court and will not be considered here.

[3]    Mr. Robinson complains that when he told Mr. McFarland that his assigned "wheelchair pusher," Martin Wynne, made sexual advances toward him, Mr. Robinson – not Wynne – was transferred to HU 2. ECF No. 46-1 at 6. Mr. Robinson does not allege that Mr. Wynne actually assaulted him, or that his complaint about Mr. Wynne was ignored. Mr. McFarland denies having been told that Wynne was assaultive. ECF No. 33-3 at ¶ 15. The dispute of fact is not material to the outcome of this case.

Mr. McFarland explains that because Mr. Robinson had been designated as "medically unassigned" since July of 2009, he was deemed ineligible to participate in the program as a trainer.[4] ECF No. 33 at ¶ 6. VetDog Program participants were assigned to a single cell to accommodate a large dog crate required for a Labrador puppy. *Id.* at ¶ 7. Mr. McFarland further explains that wheelchair bound inmates could not be involved in the program when it commenced because the cells used for the program had been converted to single-occupancy cells and wheelchairs took up too much space to accommodate the occupant, the wheelchair, and the crate used for the puppies.[5] *Id.*

Mr. Robinson and "six or seven" fellow prisoners, most of whom used wheelchairs, were moved from Housing Unit 1 to Housing Unit 2 to make space for the VetDog participants. ECF No. 33-3 at ¶ 8. The reassigned cells were located in disability accessible areas of WCI. *Id.* Mr. McFarland denies reassigning Mr. Robinson because he filed ARP WCI-1413-12 concerning his inability to participate in the VetDog program, noting that others were also reassigned to accommodate the program. *Id.* at ¶ 9. Mr. McFarland states that race did not play a role as to who was chosen to participate, and notes that the "program started with six inmates, and about 4 of the inmates were African-American." *Id.,* ¶ 11. As the program continued, it was "expanded to 18 inmates, and about a dozen of the inmates were minorities." *Id.*

---

[4]    The criteria are outlined in WCI ID #100.0002.05.3. ECF No. 33-2 at 13-21, Decl. of Renee M. Emerick, WCI Administrative Aide/Litigation Coordinator.

[5]    An ARP response from Mr. Bishop cites Institutional Directive 100.0002.05.3.04.A, stating a program participant must be within seven years of release. ECF No. 46-15 at 1. This is incorrect. A copy of the directive relied upon in *Savoy v. Bishop, et al.,* Civil Action No. GLR-14-1853, ECF No. 16-4 at 3-4, states that participants must be at least seven years from their current mandatory release date.

Mr. McFarland told Mr. Robinson that he could request a return to HU 1 when space became available, but he received no such request. ECF No. 33-3 at ¶ 10. In any event, Mr. Robinson was moved back to HU 1 on January 21, 2016. *Id.* According to Mr. McFarland, Mr. Robinson's cell was searched after medical staff received a form from Mr. Robinson that may have been forged. *Id.* at ¶ 12. It was later determined that the form was not forged. *Id.* Mr. McFarland also states that Mr. Robinson did not inform him about sexual harassment by a fellow prisoner and that Mr. Robinson's transfer from HU 1 was not undertaken to "protect" any prisoner that had harassed him. *Id.,* at ¶¶ 14-15.

Alicia Cartwright denies Mr. Robinson's allegation that she conspired with others to violate his due process right or to dismiss his ARPs. ECF No. 33-5, Decl. of CO II Alicia A. Cartwright, at ¶ 6. She notes that Mr. Robinson had the right to appeal any dismissal of an ARP to the Commissioner and when he did so with the ARPs she recommended dismissing, the Commissioner affirmed the dismissals. *Id.* at ¶ 7.

Joseph McKenzie, who served as a tier officer on a tier where Mr. Robinson was not assigned in 2013, denies that he ordered Ms. Cartwright and Mr. Rice to "shake down" Mr. Robinson's cell. ECF No. 33-6, Decl. of CO II Joseph M. McKenzie at ¶¶ 4, 5. Mr. McKenzie also denies Mr. Robinson's claim that Mr. McKenzie would process his money vouchers for outgoing legal mail, then throw the mail on the floor. *Id.* at ¶ 7. Mr. McKenzie states that requests to process money vouchers for outgoing legal mail and requests for telephone time are "not an imposition on tier officers" and involve simply "taking the mail slip, signing it, and giving it to the sergeant in the control room." *Id.* He adds, "there is no reason to refuse to process the requests." *Id.*

Brant Rice, who was an officer assigned to HU 1 with varying duties, also avers that he did not harass, threaten, or curse at Mr. Robinson. ECF No. 33-7, CO II Brant A. Rice Decl. at ¶¶ 5-6. Mr. Rice adds that "Mr. Robinson is known for chronic complaining, and for filing repeated [ARPs]" and, based on that reputation, Mr. Rice "tried not to engage him in order to avoid being a target for his administrative complaints." *Id*. at ¶ 7.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted)

(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Affirmative Defenses**

A. <u>Supervisory Liability</u>

Former Warden Bishop seeks dismissal from suit. He argues that Mr. Robinson does not specify how Mr. Bishop's actions caused Mr. Robinson to suffer a violation of constitutional rights. Review of the complaint lends support to Mr. Bishop's defense that he was named based upon his role as a supervisor, a doctrine known as "respondeat superior." In the context of a civil rights action, the liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Where, as here, a plaintiff fails to establish the factors establishing knowledge of constitutional injury, supervisory liability is not established. The claims against Defendant Bishop are dismissed.

B.    Qualified Immunity

Defendants raise a defense of qualified immunity.  ECF No. 33 at 21.  "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  When evaluating whether a right was clearly established at the time of a violation, a court typically inquires whether "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted."  *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–202 (2001)).

Qualified immunity also shields government officials who, in light of clearly established law, could reasonably believe that their actions were lawful, even if those actions later are deemed to violate the constitution.  *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Scinto v. Stansberry*, 841 F.3d 219, 235 (2016).  In *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 395 (4th Cir. 2014), the court reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts, supra*, at 730 F.3d 391; *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012).  Thus, "a government official who is sued in his individual capacity may invoke qualified immunity."  *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.[6]

---

[6]    The defense of qualified immunity does not apply to claims for injunctive relief.  *See Pearson v. Callahan*, 555 U.S. at 242-43 (affirming that defendants may not seek qualified immunity "in cases in which that defense is not available, such as … § 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages"); *Lefemine v. Wideman*, 672 F.3d 292, 303-04 (4th Cir. 2012) ("Claims for declaratory and injunctive relief are

The doctrine weighs two important values—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In conducting the qualified immunity analysis, a court must first identify that specific right asserted by the plaintiff that was infringed upon by the alleged misconduct. *See Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). The court then must engage in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). This examination may occur in either order. *Pearson*, 555 U.S. at 236.

In determining whether a right was clearly established, courts in this circuit "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose,'" as of the date of the conduct at issue. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citations omitted). "[A] right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself." *Owens*, 767 F.3d at 399. However, there need not be a case directly on point. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2015).

A First Amendment retaliation claim under § 1983 requires proof that (1) a plaintiff engaged in constitutionally protected First Amendment activity, (2) a defendant took an action that adversely affected that protected activity, and (3) there was a causal relationship between the

---

not affected by qualified immunity."), *rev'd on other grounds*, 568 U.S. 1 (2012); *accord Vollette v. Watson*, 937 F. Supp. 2d 706, 720 (E. D. Va. 2013). In addition to damages, Mr. Robinson seeks injunctive relief, and states that his claims are against Defendants in their individual capacities. ECF No. 46 at 2, 55.

protected activity and defendant's conduct. *Suarez Corp. Indus. V. McGraw,* 202 F.3d 676, 686 (4th Cir. 2000).

A prisoner's resort to the administrative remedy procedure is a protected First Amendment activity and prison officials may not retaliate against the prisoner for filing an administrative complaint. *See Booker v. S.C. Dept. of Corr.,* 855 F.3d 533 (4th Cir. 2017). Mr. Robinson's exclusion from the program occurred in 2012; by inference, however, his claims of ongoing harassment, cell reassignments, and concerns regarding ADA compliance are alleged to be ongoing and occurring as a result of his use of the prisoner grievance process. Given these allegations and based on *Booker,* this court finds that Mr. Robinson has a clearly established First Amendment right to be free from retaliation for filing grievances, and prison officials are not entitled to qualified immunity based on such a claim.

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). Title II of the ADA, which is at issue here, prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132.

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). State

prisoners may qualify as "qualified individual[s] with . . . disabilit[ies]," *id*., so as to come within the protection of Title II of the ADA.

In *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998), a unanimous Supreme Court held that "the plain text of Title II of the ADA unambiguously extends to state prison inmates." Although the Fourth Circuit "has not squarely addressed the issue," several circuits "have determined that § 12132's words 'or be subjected to discrimination by that entity' are meant to be a 'catch-all phrase that prohibits all discrimination by a public entity, regardless of the context'"—in other words, that Title II of the ADA applies to "'anything a public entity does.'" *Seremeth v. Bd. of Cty. Comm'rs of Frederick*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011) (collecting authority). ADA accommodation within the prison setting is not new; Defendants cannot invoke qualified immunity with regard to Mr. Robinson's ADA claim.[7]

Mr. Robinson claims that he is repeatedly cursed by Defendants and that his complaint concerning sexual advances by his "wheelchair pusher" resulted in Mr. Robinson's transfer, rather than any sanctioning of the assaultive prisoner.

Verbal abuse of prisoners by correctional personnel, without more, states no claim of assault. *Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979). However, a threat of harm combined with action apparently designed to carry out such threat may state an Eighth Amendment claim, *Hudspeth v. Figgins*, 584 F.2d 1345 (4th Cir. 1978), and may state a claim of denial of access to

---

[7] In *Chase v. Baskerville*, 508 F.Supp.2d 492 (E.D. Va. 2007) (Hudson, J.), aff'd, 305 Fed. App'x 135 (4th Cir. Dec. 31, 2008), the court recognized that "in the context of state prisons, Title II validly abrogates state sovereign immunity and 'creates a private cause of action for damages against the States' only 'for conduct that actually violates the Fourteenth Amendment.'" *Id*. at 506, citing *United States v. Georgia,* 546 U.S. 151, 159 (2006) (emphasis in original). Thus, if Mr. Robinson's inability to participate in the VetDog Program is found not to violate the Fourteenth Amendment, his claim under Title II of the ADA likewise must be dismissed.

courts if threats were intended to intimidate the prisoner from exercising that right. *Id., see also Russell v. Oliver*, 552 F.2d 115 (4th Cir. 1977).

A plaintiff who suffers a sexual assault by another prisoner that is facilitated by correctional staff has "suffered grave deprivations of [his] Eighth Amendment rights." *See Woodford v. Ngo,* 548 U.S. 81,118 (Breyer, J., dissenting); *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.") (internal citation omitted). Courts have recognized, however, that not every allegation of sexual abuse is "objectively, sufficiently serious" for purposes of the Eighth Amendment. *Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir. 1997) ("[I]solated episodes of harassment and touching . . . are despicable . . . . But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.") (*citing Farmer,* 511 U.S. at 833–34). Instead, courts must conduct a fact-intensive, case-by-case inquiry to determine if the sexual abuse was sufficiently serious. The case law concerning such misconduct is long standing and defeats Defendants' claim that they are entitled to qualified immunity

**Analysis**

A. ADA Claims

Mr. Robinson alleges violation of the ADA based on his rejection from the VetDog program and his resulting transfer from a handicap accessible cell on the Honors Tier in HU 1 to a cell in HU 2 that did not accommodate his disability. The claims, although appropriately alleged against Defendants in their official capacities, do not survive scrutiny.[8]

---

[8] The Fourth Circuit has held that the ADA does not recognize a cause of action against employees in their individual capacities. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471 (4th Cir. 1999); *see also* 42 U.S.C. § 12132 (providing a remedy only against a "public entity"); *McNulty v. Bd. of Educ. of Calvert Cnty.,* No. CIV.A. DKC 2003–2520, 2004 WL 1554401, at *6 (D. Md. July 8, 2004) ("As with Title II of the ADA, Section 504 of the Rehabilitation Act 'does not permit actions against persons in their individual capacities.'") (quoting *Baird*, 192 F.3d at

13

Title II of the ADA, 42 U.S.C. § 12131, *et seq.,* prohibits qualified individuals with disabilities from being excluded from participation in or being denied the benefits of the services, programs or activities of a public entity.[9] Under the Title II of the ADA, Mr. Robinson must show that: (1) he is a person with a disability as defined by statute; (2) he is otherwise qualified for the benefit in question; (3) he was excluded from the benefit due to discrimination based upon disability; and (4) the entity that provides the benefits is a public entity. *See* 42 U.S.C. § 12132; *Doe v. University of Maryland Medical System*, 50 F.3d 1261, 1265 (4th Cir. 1995); *Hallett v. New York*, 109 F. Supp .2d 190, 198 (S. D. N.Y. 2000). To that end, the Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Baltimore*, 515 F.3d 356, 362 (4th Cir. 2012).

Defendants note that participants in the VetDog program lived in single-cell housing containing a large dog crate. The space restriction and presence of the crate made it impractical, if not impossible, for a wheelchair-bound individual to navigate within the confines of the cell shared with a Labrador retriever puppy. This lack of space, in and of itself, is irrelevant, because Mr. Robinson has not otherwise qualified for program participation.

To the extent that it can be deemed a "benefit," the VetDog program is not available to all WCI prisoners, including those deemed able-bodied. At its core, it is designated as a "job assignment," with mandatory performance requirements. *Savoy,* Civil Action No. GLR-14-1853,

---

472). Mr. Robinson's ADA claims against Defendants in their individual capacities must be dismissed.

[9]   Courts have held that compensatory damages may be awarded under Title II of the ADA if a public entity "intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Mark H. v. Lemahieu,* 513 F.3d 922, 938 (9th Cir. 2008); accord *Adams v. Montgomery College (Rockville)*, 834 F.Supp.2d 386, 393–95 (D. Md. 2011) (applying deliberate indifference standard).

ECF No. 16-4 at 4, ¶ .04B.i. As a prisoner, Mr. Robinson has no constitutional right to job opportunities while incarcerated. *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir. 1980); *Awalt v. Whalen*, 809 F. Supp. 414, 416–17 (E.D. Va. 1992) (prisoners do not have a constitutionally-protected right to work while incarcerated, or to remain in a particular job once assigned). Mr. Robinson lacks a constitutionally protected liberty interest in any particular job assignment or work detail. *Johnson v. Knable*, 862 F.2d 314 (table) ("[P]rison work assignments are matters within the discretion of prison officials, and denial of employment does not, in and of itself, abridge any constitutional right of the inmate."). Classifications and work assignments of prisoners remain matters of prison administration and fall within the discretion of the prison administrators. *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978). Therefore, the fact that Mr. Robinson was not permitted to work in a particular institutional job, in and of itself, fails to state a cognizable claim. In fact, since 2009 Mr. Robinson remained "medically unassigned" with regard to prison jobs, and thus deemed unable to work any job detail.[10] This medically designated inability to work represents a neutral-based reason for barring Mr. Robinson's entry into the program. Further, the racial make-up of program participants demonstrates that race played no role in the determination that Mr. Robinson could not work in the VetDog program. *See* McFarland Decl., ECF No. 33-3 at ¶ 11.

Mr. Robinson's complaint regarding his transfer from HU 1 to HU 2 to accommodate VetDog program participants likewise fails. Courts (including several federal appellate courts, as well as district courts in the Fourth Circuit) have held that compensatory damages may be awarded under Title II of the ADA if a public entity "intentionally or with deliberate indifference fails to

---

[10] Nothing suggests that Mr. Robinson formally applied to the program. The application and medical/psychological condition review form can be found at ECF No. 16-4 at 9-10, in *Savoy,* Civil Action No. GLR-14-1853.

provide meaningful access or reasonable accommodation to disabled persons." *Mark H. v. Lemahieu*, 513 F.3d at 938; accord *Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d at 393-95 (applying deliberate indifference standard); *Paulone, supra,* 787 F. Supp. 2d at 373-74 (collecting cases endorsing deliberate indifference standard). Jeffrey Nines, former Case Management Supervisor at WCI,[11] avers that he, together with a maintenance supervisor and maintenance officer, inspected HU 2 to address ADA concerns and promptly rectified various problems. Problems resolved included: modification and removal of several bolted-down chairs to allow for wheelchair access; the lowering of a bulletin board; adjustment of the height of a hot pot and microwave;[12] the addition of shower wands and fold-down benches in the shower area; installation of grab bars in cell bathrooms that are accessible to their occupants even during recreation periods; and replacement of dangerous metal lockers with metal drawers that could be stored under bunks and thus out of the way of the turning radius of wheelchairs. ECF No. 33-4, Nines Decl. at ¶ 8. Any injunctive relief sought to rectify ADA concerns is therefore moot.

B.    Retaliation

In order to prevail on a claim of retaliation, Mr. Robinson "must allege [and prove] either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). He has met this initial burden by alleging that his transfers within WCI, a cell "shake-down," systemic denial of his ARP grievances, frequent verbal abuse by corrections personnel, and incidents where his outgoing mail was thrown on the floor were all linked to his use of the prison grievance process

---

[11]    Mr. Nines currently is Assistant Warden at North Branch Correctional Institution. ECF No. 33-4 at ¶ 2.

[12]    Unlike the Plaintiff in *Savoy*, there is no allegation here that Mr. Robinson suffered an injury as the result of the height of the hot pot and microwave.

to protest his exclusion from VetDog participation, the assignment of a "wheelchair pusher" who was a sexual predator, and the signing of a petition on behalf of fellow prisoner Savoy.

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Md., Inc. v. Wicomico Cty, Md.*, 999 F.2d 780, 785 (4th Cir. 1993). In the prison context, retaliation claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

To make out a prima facie case of retaliation, Mr. Robinson has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind Defendants' conduct. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). He must also show that retaliation was the "actual motivating factor" in the adverse action. *See McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979). Mr. Robinson cannot prevail if the retaliatory action advanced legitimate goals of the correctional institution or was narrowly tailored to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 & n. 4 (9th Cir. 1985). If Mr. Robinson makes a prima facie showing, the burden shifts to Defendants to demonstrate that they would have reached the same decision even in the absence of Mr. Robinson's constitutionally protected conduct. *Mt. Healthy*, 429 U.S. at 287. Using these standards, the court now examines Mr. Robinson's retaliation claims with regard to his transfer to first one, then another housing unit, a cell "shake-down," denial of his ARP grievances, verbal abuse, and interference with his outgoing mail and telephone vouchers.

Mr. Robinson had no constitutional right to remain on HU 1 at the time of his transfer.[13] He did, however, have every right to ADA compliance with regard to conditions of confinement in HU 2. These concerns were promptly investigated, and accommodations were put in place. Further, his temporary transfer out of HU 2 was, by Mr. Robinson's own assessment, arranged in part in response to protect Mr. Robinson after he reported that a fellow prisoner had made sexual advances towards him. Ultimately, Mr. Robinson returned to HU 1. Thus, there is no causal relationship between Mr. Robinson's filing of grievances and his transfer to other areas of the prison.

Defendants explain that Mr. Robinson's cell was searched because medical staff received a form from him that they believed may have been forged. After the search, it was determined that the form was legitimate. ECF No. 33-3, McFarland Decl. at ¶ 12. Because the search was undertaken to address a legitimate security concern, Mr. Robinson's claim of retaliation with regard to the search fails.

Mr. Robinson provides no factual basis to support his claim that his ARPs and other grievances are systematically denied. Mr. Robinson is a prolific filer; based on the many ARP submissions provided in this case, it appears that his ARPs are received, processed, and considered, although often found to be without merit. Mr. Robinson points to no instance where prison officials refused to accept his ARPs and thus impaired his ability to exhaust administrative remedies as a condition precedent to filing a court action.

Mr. Robinson's claim that Defendants routinely use inappropriate language and curse at him is also unavailing. Verbal abuse of prisoners by correctional staff is inappropriate; however,

---

[13] In the prison context, a liberty interest may be created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). A transfer from one housing unit to another does not create an atypical and significant hardship, especially here, where ADA compliance was prioritized.

without more, it states no claim of assault. *See Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979); *see also Carter v. Morris*, 164 F.3d 215, 219, n 3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim). The language allegedly used in this case is not condoned by this court, but it falls short of acts forbidden by the Fourteenth or Eighth Amendments. *See Pink v. Lester*, 52 F.3d 73, 75 (1995)) ("not all undesirable behavior by state actors is unconstitutional.").

Mr. Robinson fails to provide a clear factual basis for his claim regarding the processing of money vouchers for outgoing mail or telephone time. Prisoner claims regarding legal mail are typically analyzed as access to court claims. To state a constitutional claim for denial of access to the courts, a prisoner must show that the alleged shortcomings "hindered his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343*,* 351 (1996). Mr. Robinson has advised of no actual injury or specific harm which he suffered as a result of the alleged mishandling of his outgoing legal mail, nor has he demonstrated that any delay in processing of his mail was done for the purpose of retaliating against him. Likewise, to state a claim based on delay or non-delivery of legal mail, the prisoner must allege adverse consequences as a basis for the allegation that delay, or non-delivery deprived him of meaningful access to courts. *See Lewis*, 518 U.S. at 349*; see also Morgan v. Montanye*, 516 F.2d 1367 (2d Cir. 1975) (single interference did not violate Sixth Amendment).

To the extent Mr. Robinson is complaining about the handling of personal mail, isolated instances of mishandling of such mail do not constitute valid constitutional claims, *Buie v. Jones*, 717 F.2d 925, 926 (4th Cir. 1983) (isolated incident of mishandling does not show actionable pattern or practice), and an occasional incident of delay or non-delivery of mail does not rise to a constitutional level. *Gardner v. Howard*, 109 F.3d 427, 430-31 (8th Cir. 1997); *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990). Mr. Robinson demonstrates no actual injury as a result of any

irregularity with the processing of his money vouchers or mail and does not delineate any injury suffered due to a lack of telephone access; therefore, Defendants are entitled to summary judgment in their favor as to Mr. Robinson's retaliation claims.

C.    Equal Protection

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted).  In cases where no suspect criterion, such as race, is involved, the proper inquiry is whether the statute or regulation serves a legitimate state interest and whether the challenged classification is rationally related to it. *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989).  "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quotation omitted).  So long as the restrictions placed on prisoners do not jeopardize their health and there is a rational relationship between those restrictions and the need for protection of the prisoners, equal protection is not violated. *Taylor v. Rogers*, 781 F.2d 1050 (4th Cir. 1986).

Mr. Robinson complains that he and other handicapped prisoners, who had earned privileges and were on an "honor tier" in HU 1, were not afforded similar privileges after their move to other housing units.  To state an equal protection claim, Mr. Robinson must demonstrate that he was treated differently than similarly situated prisoners and intentional or purposeful discrimination motivated the decision. *See Williams v. Bitner*, 307 Fed. App'x. 609, 611 (3d Cir. 2009) (citing *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985)).  If the discrimination alleged occurred due to Mr. Robinson's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling government interest.  Otherwise, Mr. Robinson must show that

the discrimination did not bear a rational relationship to a legitimate government purpose.  *See Cleburne*, 473 U.S. at 440-42.

The dissolution of an entire program (the Honor Tier), without regard to any suspect classification criteria of the prisoners populating the Honor Tier, is not a tenable equal protection claim.  The sole criteria at play here was that Mr. Robinson was among other inmates who were housed on the Honor Tier and were moved to accommodate another program.  None of the Honor Tier inmates were singled out for disparate treatment, including Mr. Robinson.

### Conclusion

For the aforesaid reasons the claims against Defendants Bishop, Thomas, and Western Correctional Institution are DISMISSED; and Defendants' motion, construed as a motion for summary judgment, is GRANTED.

A separate Order follows.


July 8, 2021                                        _____/s/_____
                                                             DEBORAH K. CHASANOW
                                                             United States District Judge